(No. 37074.—

REPUBLIC STEEL CORPORATION, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(Bernice Fountain, Admx., Defendant in Error.)

*Opinion filed Sept. 28, 1962.—Rehearing denied Nov. 29, 1962.*

STEVENSON, CONAGHAN, HACKBERT, ROOKS AND PITTS, of Chicago, (DOUGLAS F. STEVENSON, of counsel,) for plaintiff in error.

KLEIMAN, CORNFIELD & FELDMAN, of Chicago, (BERNARD KLEIMAN and JASON GESMER, of counsel,) for defendant in error.

Mr. JUSTICE UNDERWOOD delivered the opinion of the court:

On December 3, 1958, William Fountain filed with the Industrial Commission an application for adjustment of

claim against Republic Steel Corporation, alleging that on March 26, 1958, he was injured by reason of an accident arising out of and in the course of his employment in that he sustained a heart attack while at work. At the hearing before an arbitrator it was stipulated that on March 26, 1958, both parties were operating under the provisions of the Illinois Workmen's Compensation Act, and the relationship of employer and employee existed between the parties on that date. It was further stipulated that Fountain's earnings for the year next preceding the alleged injury were $4,784; that his average weekly wage was $92; that on March 26, 1958, Fountain was 50 years of age and had one child under 18 years of age; and that no compensation had been paid on account of the alleged injury.

The arbitrator, after hearing evidence introduced by both parties, found that Fountain failed to prove that he sustained any accidental injury arising out of and in the course of his employment by Republic, and denied the claim for compensation. The arbitrator's decision, which was filed with the Industrial Commission on September 24, 1959, further found no compensation had been paid by Republic, but that Republic had furnished necessary first aid, medical, surgical and hospital services.

On October 7, 1959, Fountain filed his petition with the Commission asking for a review of the arbitrator's decision. On March 11, 1960, the hearing on review was held before the Industrial Commission, at which time the parties stipulated that the record before the arbitrator should be the sole evidence. On June 13, 1960, the Industrial Commission set aside the decision of the arbitrator, and found Fountain did sustain accidental injuries arising out of and in the course of his employment on March 26, 1958, and that he became permanently and totally incapacitated for work. The Commission ordered Republic to pay Fountain $40 per week for 281 weeks, $10 for one week, and thereafter an annual pension for life of $1350, payable in 12

equal monthly installments pursuant to section 8(f) of the Workmen's Compensation Act (Ill. Rev. Stat. 1957, chap. 48, pars. 138.1 *et seq.*). The Commission further ordered that Republic have credit for all sums of money, if any, previously paid on account of the injury. This order found that on March 26, 1958, Republic was operating under the act, that the relationship of employer and employee existed, that notice of the accident was given within the time required under the act, and contained the same additional findings as to earnings, age and dependency of Fountain and the furnishing by Republic of necessary first aid, medical, surgical and hospital services that the arbitrator had previously found in his order.

On July 1, 1960, Republic filed its petition for a writ of *certiorari* with the superior court of Cook County, and on October 17, 1960, before any hearing had been had in the superior court, Fountain died. On June 9, 1961, Republic filed a motion suggesting the death and asking the proceedings be abated. Thereafter, on December 1, 1961, a motion was filed on behalf of Bernice Fountain, administratrix of Fountain's estate by appointment of the superior court of Lake County, Indiana, asking leave to substitute the administratrix as petitioner in place of the decedent. Republic filed its answer objecting to the administratrix's motion to substitute and renewing its motion to abate and extinguish the cause of action, and alleging that the widow had filed a petition with the Industrial Commission for death benefits based upon a heart attack sustained by her husband while at work on March 26, 1958. This petition, according to the record, was filed with the Commission on October 16, 1961, less than one year after Fountain's death, and alleges Fountain left surviving his widow (who is the same person as the administratrix) and one child under 18 years of age.

On December 5, 1961, the superior court of Cook County entered an order substituting the administratrix for the deceased Fountain, allowing Republic credit under section

8(j) of the act for $1400 paid by its group insurance plan, and ordering Republic to pay to the administratrix of Fountain's estate the amount of compensation accrued as of October 17, 1960. The order abates any other compensation due under the award, and affirms the order of the Industrial Commission in all other respects. Republic Steel Corporation thereafter filed its petition for writ of error which we allowed, bringing the matter to this court for review.

The record before the arbitrator shows that on March 26, 1958, Fountain started work for Republic at 7 A.M., and was engaged at his regular job of cut-off operator. This involved the operation of a cutting machine which cuts metal pipe into proper lengths as previously designated by the inspection department and sometimes bevels or chamfers the ends of the pipe after cutting. The operator does not handle the pipe before the cutting operation and control buttons on the machine are used by the operator to bring the pipe to the proper place for cutting. After the cutting and bevelling, the operator pushes another control button and the pipe goes back to the skid or cradle which brings the pipe to cutting position. The end pieces cut off the pipe drop into a pan at the end of the machine, and the operator carries these ends to a scrap box. In this case there were two scrap boxes, one about 4 or 5 feet away and the other about 10 feet away. The actual cutting operation is automatic and controlled by pushbuttons. The operator occasionally has to straighten the pipe into position for cutting and for that purpose a turning stick similar to a pick handle is used, but he does not have to pull or lift the pipe. Sometimes the operator has a helper, sometimes not.

The scrap ends picked up by the operator vary in size and length from 3½ inches to 5 feet, and some are so large and heavy it takes two men to handle them. Herbert Williams, general foreman in Republic's tube finishing mill, in charge of the operation where Fountain was working on

March 26, 1958, testified that the company records indicate Fountain's machine processed fourteen pieces of 7-inch outside-diameter pipe between 7 and 8 o'clock that morning, the machine operating a half-hour, and the other half-hour being delay time waiting for recuts. Between 8 and 9 o'clock, 4 pieces of 7-inch pipe were cut taking $\frac{2}{10}$ of an hour, and the remaining $\frac{8}{10}$ of the hour was delay time. The machine did not operate after 9 A.M. until 2 P.M., which was after Fountain had left the area. Williams further testified the records showed that 13 of the 7-inch pipes were .317 gauge, weighing 23 pounds per lineal foot; one piece was .498 gauge, weighing 32 pounds per lineal foot; and 4 pieces were .362 gauge. The machine records were received into evidence after Williams' testimony.

Fountain testified that he was feeling pretty good when he started to work at 7 A.M.; that he had slept well the night before, and had not been sick; that around 9 or 9:30 in the morning he got a sharp pain in his chest while he was bending over picking up scrap pieces of pipe. He had picked up one piece of scrap over 3 feet long weighing 100 pounds or more. He had worked on rejects all morning and estimated he had spent about one hour picking up scrap and either ran the machine or waited for pipe the rest of the time. He had no helper that morning. The pain hit him so suddenly that he dropped the scrap end and straightened up and stood around waiting for the pain to pass. Then he picked up some more scrap, but the pain got worse and he stopped. He tried to find his foreman, Joe Bondi, to tell him he wanted to go home. He couldn't find Bondi, but found Herbert Williams, the general foreman, and told him he did not feel good and wanted to go home. Williams told him to see Bondi first. He then walked about 300 feet and found Bondi, telling him the same thing—that he didn't feel good and wanted to go home. Bondi said he would get him a pass. Fountain then went upstairs to change clothes, but the pain was so severe he lay down on a bench.

He could not bend over to untie his shoes. Bondi then brought the pass, and Fountain changed his clothes, washed up, and started for the dispensary, since Bondi had told him he would have to check out through the dispensary. He walked about two blocks through the building and another three blocks to the dispensary where he told the nurse he had pains. She got a Dr. Little to examine him, and after listening to his chest with a stethoscope, Dr. Little sent him to the hospital. A company employee drove Fountain to St. Margaret's Hospital in Hammond, Indiana, where he was discharged at the street entrance, rather than the emergency entrance. Fountain then walked into the hospital and checked himself in. He remained in the hospital for 31 days under the care of his personal physician and two other doctors. The hospital records were received in evidence by agreement.

Fountain further testified that while he was off work, he received $42 a week for 26 weeks from Metropolitan Life Insurance Company under the company group health plan, a total of $1092. In September, 1958, he went back to Republic after his doctor released him for light duty, but was told by the nurse there was no light duty available. He neither looked for other work nor worked at any other job after March 26, 1958. He testified that his wife had filled out the group insurance benefit applications, but that he had signed them. He had had no chest pains or difficulty with his heart before March 26, 1958.

The claimant presented the testimony of Dr. George L. Perusse of Chicago, an industrial surgeon and specialist in geriatrics, who examined Fountain on April 2, 1959, including the taking of an electrocardiogram, and compared it with the electrocardiograms taken at the time of Fountain's admission to the hospital. He diagnosed Fountain's condition at the time of the examination as old myocardial infarction, marked coronary insufficiency, with left heart strain, and no cardiographic reserve. In answer to a lengthy hypo-

thetical question, Dr. Perusse expressed the opinion that there was a direct causal connection between the hypothetical individual's present state of ill-being and his exertion of that morning (March 26, 1958). On cross-examination, he testified that lifting one end of a hundred-pound pipe could very definitely be the cause of this heart condition.

The employer's evidence consisted of the testimony of Williams, Bondi and numerous exhibits consisting of the personnel reports of the incident filed by Williams and Bondi, photographs of the machine operated by Fountain and of the cradles or pockets into which the pipe rolls after cutting, the production records of the Fountain machine and others in the group operation for the period from March 19 to March 29, 1958, and Fountain's group insurance application, the latter being employer's exhibit 6.

We have detailed the history of this litigation and the evidence in the record because of the errors assigned by plaintiff in error and its contention that previous holdings by this court have been disregarded or misinterpreted by the Industrial Commission in heart cases and its request that clarifying expression and guidance be given by us. Republic contends in the first place that there was no claim of accident or notice of accident given by Fountain until the filing of the application for adjustment of claim with the Industrial Commission on December 3, 1958. The act (Ill. Rev. Stat. 1957, chap. 48, par. 138.6(c)) provides that no proceedings for compensation shall be maintained unless oral or written notice of the accident is given the employer not later than 45 days after the accident. It is undisputed that Fountain told his foreman, Bondi, the general foreman, Williams, the nurse and the doctor at the company dispensary, and the company employee who drove him to the hospital, that he "didn't feel good," and had chest pains, and wanted to go home. The employer through its supervisory employees knew almost immediately of the physical ill-being of Fountain, and knew he had worked at least 2 to 2½

hours on the morning of March 26, 1958, without complaint. It is true that employer's exhibit 6, being the statement of claim for group sickness benefits, contains only the name, age, address, and date of disablement over Fountain's signature dated 4/14/1958. But we note that immediately below Fountain's signature, in the position to be completed by the employer, the only additional information given over the signature of the employer on April 15, 1958, is the certificate and group numbers, the amount of weekly benefit, issue date of benefit, a statement that the insurance is in force, and the date Fountain last worked. Fountain failed to fill in the following blanks:

"4. If an accident was involved, answer the following:
    (a) When did the accident happen? Date————,
        19—— at ————A.M.
             hour   P.M.
    (b) Were you at work when the accident happened?
       —————
       yes or no
    (c) Give a brief description of the accident.————
       ————————————————————."

Republic Steel Corporation failed to fill in the following blanks on the same page of the form:

"5. Was disability sustained in course of employment?
     ————————. If "yes", show computation below:"
        (Then follows requests for information relative
        to Workmen's Compensation benefits.)
"6. Give any information which might assist the Company in the consideration of this claim.————
    ————————————————————."

On the reverse side of exhibit 6 is information completed by Dr. M. B. Gevertz of Hammond, Indiana, Fountain's personal physician, completed April 10, 1958, showing his first treatment on 3/26/58; last treatment, "4/10/58, still in hospital," diagnosis as "coronary thrombosis," and that it was indefinite as to when Fountain could resume work.

The question, "7. If this disability is the result of the patient's occupation, explain fully————————.", was unanswered.

In *Quaker Oats Co.* v. *Industrial Com.* 414 Ill. 326, we referred specifically to the provision in section 24 of the prior act, similar to the present section 6(c), "that no defect or inaccuracy of such notice shall be a bar to the maintenance of proceedings of arbitration or otherwise by the employee unless the employer proves that he is unduly prejudiced in such proceedings by such defect or inaccuracy." There we construed this provision and held that liberality in the matter of notice should be allowed to the extent that it is consistent with the protection of the employer against unjust concealment of claims. We further have indicated that the legislature intended to require an employee to give his employer all known facts within the time provided, and if not known, within a reasonable time after their ascertainment. (*Consumers Co.* v. *Industrial Com.* 364 Ill. 145.) In the instant case, there is nothing in the record to indicate the employer was in any way prejudiced by the employee's failure to advise employer of the accident, even if we assume the employee knew there was an accident. The employer knew of the heart attack and knew the type of work Fountain was engaged in the morning of March 26, 1958. The record indicates no attempt by Fountain to conceal anything, and no attempt by Republic to get any additional information either from Fountain or his doctors within 45 days of March 26, 1958. We therefore hold the weight of the evidence sustains the finding of the Commission that notice was given in a manner and within the time contemplated by the statute.

Plaintiff in error further contends that Fountain's testimony was uncorroborated and should not support an award of compensation since his story was contrary to his prior written statement. The record does not so show. The only written statement is the statement of claim for sickness benefits above referred to, and neither claims nor denies an acci-

dent. That statement, signed by Fountain on April 14, 1958, within 3 weeks of his heart attack, is no more lacking in information than the employer's and doctor's report. It certainly cannot be assumed that Fountain would then have known he sustained an accidental injury which probably arose out of and in the course of his employment. It does not appear that he had consulted with his doctor and his lawyer as to the legal evaluation of the events of March 26, 1958, when he signed the application known as exhibit 6. The facts in this record clearly are distinguishable from the facts in *Mechanics Universal Joint Division, Borg-Warner Corp.* v. *Industrial Com.* 23 Ill.2d 441, where the employee answered "no" to the question of the group-sickness form asking if he intended to present a claim for workmen's compensation, and his doctor answered negatively to the question, "Is present disability due to patient's occupation?", and present none of the conflicting statements found in *Fisher Body Division, General Motors Corp.* v. *Industrial Com.* 20 Ill.2d 538, or in *United States Steel Corp.* v. *Industrial Com.* 8 Ill.2d 407. Actually Fountain's testimony is corroborated by Williams and Bondi, the foremen called by the plaintiff in error, whose testimony established the strenuous nature of Fountain's work with respect to lifting and carrying scrap pieces, and there is no dispute that Fountain had handled 18 pipes and the scraps cut therefrom that morning.

Plaintiff in error further contends the claimant proved only a relationship in time and place between his heart attack and his employment, and failed to prove the employment was a causative factor in the disablement. The evidence amply sustains the finding of the Commission that the accident arose out of and in the course of the employment. Fountain's uncontroverted testimony of lifting the heavy piece of scrap, experiencing sharp, sudden pain, the nature of his work up to the time of the accident corroborated by the foremen, together with the medical testimony as to the

existence of a direct, causal connection between the exertion that morning and the subsequent heart condition, all combine to establish an accidental injury arising out of and in the course of the employment. As we said in *Clifford-Jacobs Co.* v. *Industrial Com.* 19 Ill.2d 236 at page 245, "The Industrial Commission determines the facts. It is within its sphere to draw reasonable inferences and conclusions from competent evidence both direct and circumstantial. This court will not weigh conflicting evidence and substitute its judgment for that of the commission. Our function is to determine whether the finding of the commission is clearly against the manifest weight of the evidence. This court will not discard permissible inferences drawn by the commission merely because it might have drawn other inferences from the facts. *Fluor Corp.* v. *Industrial Com.* 398 Ill. 616." We hold there is sufficient competent evidence in this record to sustain the finding of the Commission that Fountain sustained an accidental injury compensable under the Workmen's Compensation Act.

Plaintiff in error argues that past decisions of this court have led the Industrial Commission to believe and to hold that every heart attack is compensable regardless of the circumstances under which it occurs. We desire to dispel this notion, if in fact it exists. We are aware of no decision of this court sustaining compensation for a heart attack in the absence of proof, controverted or otherwise, of a causal connection between some phase of the employment and the resulting disability or death. In *Clifford-Jacobs Co.* v. *Industrial Commission,* 19 Ill.2d 236, where the employee became sick after working at his job for one and one-half hours and died shortly thereafter after driving home, we affirmed the death award to the employee's widow and said (page 244) : "It is not necessary that an employee receive some external violence for the injury to be accidental within the meaning of the Workmen's Compensation Act. Where an employee, in the performance of his work, is suddenly

disabled, an accidental injury is sustained even though the result would not have been obtained had he been in normal health. If a workman's existing physical structure gives way *under the stress of his labor*, his death is an accident which arises out of his employment. (*Town of Cicero* v. *Industrial Com.* 404 Ill. 487.) The applicant must prove that the death arose from the employment but he need not negative every possibility that death might have arisen other than out of the employment, where a legitimate inference from the evidence is that he died from an injury which arose out of the employment." (Italics added.)

In *Bethlehem Steel Corp.* v. *Industrial Com.* 6 Ill.2d 290, we affirmed an award for the death of an employee who collapsed from coronary thrombosis while engaged in his regular duties of carrying and heating rivets, and arranging kegs of rivets beside the furnaces. The decedent had collapsed at work a year and a half before the date of the incident in question. The medical evidence was controversial as to whether there was a causative connection between the decedent's work and his death. There we reviewed prior heart cases and confirmed the previous holdings that to establish an accidental injury under the terms of the Workmen's Compensation Act in heart cases, there need be neither external violence nor unusual strain or exertion upon the regular duties of the job, (*Baggot Co.* v. *Industrial Com.* 290 Ill. 530 *Jones Foundry and Machine Company* v. *Industrial Com.* 303 Ill. 410), nor internal herniation or rupture of the heart tissues or blood vessels, (*Marsh* v. *Industrial Com.* 386 Ill. 11), and concluded that in each instance the query is whether the unforeseen and unpremeditated giving way of a part of the employee's body, resulting in disability or death in the course of his employment, could be deemed to be *caused* or *precipitated by* his work. We held that in cases of pre-existing heart disease recovery is not necessarily precluded, depending on whether the disability or the death was the combined result of the

disease and the employee's work, or the disease alone. *Town of Cicero* v. *Industrial Com.* 404 Ill. 487.

In *La Clede Steel Co.* v. *Industrial Com.* 6 Ill.2d 296, the employee sustained a heart occlusion in the course of his habitual employment involving strenuous muscular activity of loading and wheeling heavy ore to the steel furnaces and shoveling heavy material in the furnaces amid intense heat. In view of the medical testimony connecting the exertion and the occlusion, we rejected the employer's contention that, since this was the employee's habitual employment and the occlusion might have occurred irrespective of the exertion and as a result of natural causes unrelated to the employment, it should not be deemed an accidental injury.

The issues are as to whether the injury was accidental, and as to whether it arose out of and in the course of the employment. We believe the standards set forth in *Clifford-Jacobs* v. *Industrial Com.* 19 Ill.2d 236, hereinbefore quoted, are adequate guidelines for determining when an injury is accidental, and we hereby reaffirm them.

As to whether the injury arose out of and in the course of the employment, it will be observed that all prior decisions of this court require a causal connection between the employment and the resulting ill-being. We have not heretofore held, and do not now hold that because a heart attack occurs at work, it is automatically compensable. To come within the statute the employee must prove that some act or phase of the employment was a causative factor in the ensuing injury. He need not prove it was the sole causative factor nor even that it was the principal causative factor, but only that it was *a* causative factor in the resulting injury. In the absence of such proof, the injury is not compensable. The record here amply sustains the inferences drawn by the Industrial Commission that the acts required of Fountain in the course of his employment were a causative factor in his injury.

Plaintiff in error further contends it was error to permit

the substitution of Fountain's administratrix more than one year after Fountain's death and more than 90 days after his death was suggested to the court by Republic. Section 6(c) of the Workmen's Compensation Act, cited by counsel, has no application to this case since that section refers specifically to proceedings involving, "an accidental injury resulting in death." Here, the substitution of the administratrix was for the purpose of enabling the administratrix to collect the payments accrued up to the date of death. Section 54(2) of the Civil Practice Act (Ill. Rev. Stat. 1959, chap. 110, par. 54(2)) is not applicable to proceedings under the Workmen's Compensation Act.

Plaintiff in error argues that the administratrix has no standing to collect workmen's compensation benefits, which can be paid only to dependents, and that the benefits which had accrued from March 26, 1958, to the date of death on October 17, 1960, should be abated. In *Central Illinois Light Co.* v. *Industrial Com.* 359 Ill. 430, decided in 1935, the employee having secured an award from the arbitrator which was confirmed by the Commission, the employer took the case to the circuit court on *certiorari*. While the cause was there pending, the employee died, and his administrator was substituted as a party and the award for the full amount was confirmed. On writ of error, we held the award was personal to the deceased employee and that his death extinguished all payments falling due after his death, and permitted the administrator to recover only for those payments accrued to the date of death. We have on another occasion denied a petition for writ of error to review an award to a substituted administrator for compensation accrued to date of death. (See *Union Asbestos & Rubber Co.* v. *Industrial Com.* 415 Ill. 367.) While there is no specific provision in the act covering this situation, nevertheless the legislature has never seen fit to alter or amend the act in regard to the manner of payment of accrued compensation, and after nearly 30 years we may assume that it has no

quarrel with the procedure approved in the *Central Illinois Light* and *Union Asbestos* cases.

To hold that the death of Fountain abated the payments due him for 40 weeks of 1958, 52 weeks in 1959, and 41²/₇ weeks in 1960, a total of 133²/₇ weeks @ $40 per week, or $5331.43 less the $1092 paid by the group insurer, or $4239.43, would be to say that an employer need only litigate and delay the payment of compensation due a legitimately disabled individual to a point beyond his death and thereby defeat his right to compensation. (*Union Asbestos & Rubber Co.* v. *Industrial Com.* 415 Ill. 367.) The manner and cause of Fountain's death do not appear in the record, but if the widow is successful in prosecuting her claim before the Commission for death benefits, plaintiff in error will be allowed credit for the amount herein ordered to be paid the administratrix under the provisions of section 8(g).

The order of the superior court of Cook County was correct in all respects except the amount of credit for group insurance payments which is shown by the record to have been $1092. Judgment is therefore entered here that Bernice Fountain, administratrix, receive from Republic Steel Corporation, $5331.43, being the amount of accrued compensation, less $1092 credit to Republic Steel Corporation for group insurance payments. The balance of compensation accruing under the award after October 17, 1960, is abated.

*Affirmed, with judgment here.*